Next case, the United States v. Evans, and I guess we start with Mr. Zirkin. May it please the court, Gerald Zirkin representing Nelson Evans. Mr. Evans was charged with traveling interstate commerce with the intent to commit murder for hire or using interstate commerce facilities or the mail with the same intent and with conspiracy to do the same. The murder is not an element of the offense and need not even be attempted for the crime to be completed. The Eighth Circuit in U.S. v. Delfin laid out the elements of the crime very carefully. The crime is complete when the defendant travels interstate or uses interstate commerce facilities with the requisite intent. The court in that case reversed aiding and abetting conviction because the defendant's assistance to the hit man occurred after the interstate travel had occurred. So the interstate travel happened, the crime was complete, she identified targets at that point, and so she couldn't aid and abet because the crime had been completed. Here, the government had to prove that Mr. Evans entered Virginia from North Carolina with the intent to commit not just a murder, but specifically a murder for hire. The government relies on a number of circumstances in the evidence. First, that Shipman and Evans had phone calls before they traveled from Greensboro, North Carolina to Norfolk. But there is no evidence as to what was discussed in those calls. They may have just discussed how they would meet, or it may have had nothing to do with the trip at all. We have no content for those conversations. Secondly, they rely on the fact that they traveled together from Greensboro to Norfolk. Again, no evidence as to what they discussed or when they discussed what they discussed. The government invites the court to assume that they discussed a murder for hire. And importantly, the court would have to assume that they discussed committing not just a murder, but specifically a murder for hire, and that they discussed it before they reached the Virginia-North Carolina border. Next, they rely on the fact that they drove by Ms. Bond's home. That tells us nothing, however, about when Mr. Evans learned about the killing, if he did. Fourth, they say that Mr. Evans did not express surprise when Shipman mentioned the murder when they were riding with Alvon Davis. They don't attribute any statements to Mr. Evans during that drive. Maybe he thought it was unwise to react in front of Davis, whom he did not know. Okay, that's the first thing you said that unquestionably to me seems to violate the standard of review in a sufficiency challenge. Why isn't it reasonable to say, if one person says to a second person in the presence of a third, by the way, we're going to do a murder, and the third person doesn't go, wait, what are you talking about? This is the first I'm ever hearing about the fact that we're going to murder anybody, that you can infer that's because person two already knew about the murder. That seems like a reasonable inference. Well, except for the fact that, number one, he did not know of Mr. Davis. Mr. Davis was a member of a gang. My client was not a member of that gang. These are great arguments about maybe why I shouldn't draw that inference. But it's not an argument that it's unreasonable as a matter of law to draw that inference. Well, I don't think you can draw it. I don't think you can assume what is in his head for his reasons to not react. And yet the criminal law requires us to do that all the time to make assessments about what people are in their head based on how they act. That's like literally what every criminal case involves almost. So let's assume for a moment, I'll grant that and let's assume that that's the case. However, that doesn't tell us anything about when he learned about the murder. We still have this exact same problem. Did he learn it before he traveled in interstate commerce? And we don't know the answer to that. So if that's true, it doesn't help the government's case. And of course, it also doesn't address the question of murder or prior as opposed to murder. Mr. Evans lied to law enforcement, they say, when he was questioned four years after the murder. And even if that does evidence consciousness of guilt for the killing of Ms. Bond, that's far cry from its evidencing consciousness of guilt for traveling in interstate commerce to commit a murder for hire. For his lies to evidence that, you would have to know, first of all, that that was in fact an offense. And they rely on Mr. Evans, the fact that Mr. Evans killed Ms. Bond, even if that was true, it did not provide evidence of his having the intent to commit not just a murder, but a murder for hire when he crossed from North Carolina into Virginia. I think I turned the red lights on. Yes, sir. Thank you. We'll hear from Ms. Carlton. May it please the Court, I represent Appellant Caleb Shipman. The Confrontation Clause prohibits the admission of a non-testifying defendant's statements at trial if they are testimonial and if they are facially incriminating of a second defendant. There's no issue of testimonial here. The United States has conceded that. The issue is facially incriminating, and as the Supreme Court and this Court have ruled, the crux of whether a statement is facially incriminating is not what a defendant said he did, but the degree to which he implicates another defendant in that conduct. In this case, the District Court erred by reversing that. The District Court focused on the conduct being described by the non-testifying defendant and not on the fact that it implicated Mr. Shipman. Have you been able to identify a case for what our standard of review is for whether something was facially incriminating or not? No, I cited a standard of review in my brief for prudent issues, but I believe the government actually cites the more appropriate case for the standard of review here. But what is it? Because I could see, like, on the one hand, whether it's facially incriminating seems like a fact-inflected question that we would normally defer to District Court judges on, but on the other hand, the Supreme Court has told us that things like reasonable, there's some probable cause are reviewed de novo, so I mean that as a sincere question. Like, I genuinely think it's not immediately obvious what the standard of review should be of whether or not when a District Court says something is or isn't facially incriminating, what is our standard of review of that question? Well, here it would be de novo because here the District Court just got the law wrong. The Court misinterpreted this Court's decision. Okay, so they made an error of law is the argument? Correct. The District Court misinterpreted the Supreme Court's decision in Richardson v. Marsh and this Court's decision in Benson because what he did is he focused on the conduct of what was being said. But he looked at those statements in isolation. This misconstrues the Supreme Court's case in Richardson v. Marsh and this Court's holding in the United States v. Benson. In Benson, the only testimonial statement at issue in that case was a statement where a non-testifying defendant said he and others took a truck to a residence. Now, following the definition of facially incriminating advanced by the District Court and the United States here in this case, the issue in Benson should have been whether the act of taking that truck with others to a different location was incriminating. The focus would have been on the conduct. But that's not the issue when you are evaluating Bruton and the Confrontation Clause. The issue in Benson was not about the conduct. It was about whether it implicated a co-defendant, Mr. Brown, who owned the truck. And this Court held that it didn't implicate Mr. Brown because it didn't implicate Mr. Brown in the actual conduct that was being described by the non-testifying defendant. This is in sharp contrast to the non-testifying defendant's statements in this case in which he repeatedly and explicitly not only named Mr. Shipman by name but he discussed multiple times traveling to a location. It was the only time that the two of them had traveled there together, that they stayed in a certain location. In fact, he identified my client, Mr. Shipman, in a video where no one else could identify him. And we know that this conduct was incriminating as to Mr. Evans because Mr. Evans' statements were admitted at trial. How can those statements be incriminating as to Mr. Evans at trial? I thought the question that the precedent asks is not just is it incriminating but is it facially incriminating or inferentially incriminating? Don't we have cases saying the only way it's facially incriminating is if it's the very first thing that's spoken at trial and everyone would know that that incriminates him in the crime. That is a quote out of Benson. Versus inferentially, which means the jury has to piece together other pieces of evidence to see why it's incriminating to have been at the gas station at a certain time. That is correct, Your Honor. That is a quote from this court's Benson decision. But the issue, though, that you can take those quotes but that's not the evaluation the court is making in those decisions. Any piece of evidence looked at in isolation is not incriminating. Sure it is. If someone says he did it, he shot him, that's facially incriminating. That is absolutely facially incriminating. And if we followed the definition of facially incriminating advanced by the government, those would be the only statements that would be prohibited from admission at trial. Statements where a non-testifying defendant explicitly admits to the crime. We have part of the line between facially and inferentially incriminating. The court has said there's a line that those things are different and one is okay and one's not. So what is it? Well, you're talking about a standard in which you focus on how incriminating that conduct is. The standard, it's a brutal issue. It's a confrontation clause issue. The focus is does that statement implicate another defendant. No, it definitely isn't does it implicate because that would mean that every statement that arguably implicates. Your red light is on. Can I ask you, I have a different question about Judge Niemeyer. Can I ask a different question? Oh, sure. I have a double jeopardy question. Let me posit that I actually think you have quite a good double jeopardy argument, but I think that your client in particular has a very big problem. Where in the record did your client ask the district court to merge counts 7 and 8? May I look at the briefing?  I think your client might be the one who didn't. But if I'm wrong, I genuinely want to know that if I'm wrong. So we have in the brief that Mr. Shipman moved to dismiss count 7 as multiplicitous to count 8, so a merger argument, and that's at JA 152 to 158. That's the briefing, and that was it. Oh, my bad. I think I'm confusing. I'm Shipman, not Simpson. There we go. That's the mistake. Well, so Mr. Simpson's lawyer should be prepared for me to ask where they preserved their double jeopardy argument. But I believe Mr. Shipman has it. Sorry, you are absolutely right in correctly deducing that I messed up two similarly named defendants. I'm sorry. Your Honor, it's a 32 volume JA. Thank you. If there are no more questions. No, thank you very much. Thank you very much, Your Honor. All right. Okay, Mr. Dinkin, I guess we hear from you next. May police court. My name is William Dinkin, and I represent the appellate Landis Jackson. We raised a number of issues in our brief, but I'd like to focus on the sufficiency of the evidence to convict Mr. Jackson of being a member of the continuing criminal enterprise. And specifically, we contend that there was insufficient evidence to convict him because there was no evidence that he was a manager, organizer, or supervisor of five or more people. What was the evidence about Mr. Jackson? I thought there was evidence suggesting that he was Simpson's right-hand man. He had also gone to Mexico later and followed the same tracks to get cocaine, and they operated together very closely. It seemed like there was evidence of that. Is that right? Right. So the government, in their closing argument, said he was the vice president. That's the closing, right? I'm talking about the evidence. But that kind of summarizes about as good as it gets for them. There was one witness, I believe, and maybe two, that used the term right-hand man. And those are kind of conclusory labels. That's a pretty understandable term. I mean, everybody, I think, understands what a person's right-hand man. He's there helping him, has a lot of presence, consults with him, helps him, carries things out. They do things together. Right. Isn't that what a right-hand man does? Well, he could be right-hand man as in they're good friends together. They go to football games and they hang out with each other's families. That's not a right-hand man because they're not going about doing anything. A right-hand man has to help carry out functions. What I was really looking at is where's the evidence, not the conclusory label, but the evidence in the record that he was his right-hand man. And the evidence in this case— I observed them together and he was his right-hand man. Well, I would like some specifics. I think that rather than having a jury speculate as to what that means, it's fair to insist, frankly, that the jury get actual evidence as to what acts were taken to show that Mr. Jackson was a manager, a supervisor, or an organizer. Were there a lot of communications between Simpson and Jackson? There were a ton of communications. There's no question about it. The evidence really kind of divides the workforce, if you will, into two camps. The first camp is all the folks who worked for Simpson. These are people who were under surveillance. These were people where there were poll cams filming their activity. These are people who were followed making deliveries of drugs and delivery of money. These are people who testified at trial. And not anyone that testified at trial in the Simpson camp of those folks, who are all identified, said, I was under Jackson's control, I took directions from Jackson, he organized this. There was nothing there. The government really finds their support and their tie-in on these very transitory comments that are made on the intercepted calls between Jackson and Simpson, where Jackson is talking about various people that he only has nicknames of. It's Dre or Tink or High Point Dude, things like that. And what's really missing is everything that you see for the Simpson camp. We don't have surveillance of those people. We've got no controlled buys, no observations. They didn't testify. We don't even know who they are. And so what we're left with is the government asking a jury to speculate. And it's not that they exist or not. The question is, was Jackson controlling them? Was he managing them? Which this court has said, under USP Butler, proof of supervisory or managerial relationship requires a showing of some degree of control by the defendant over the other persons. And that's what's missing here. We have just names and just references to people with nothing else. And in that absence, the jury's left to speculate. I thought some of those intercepted communications where he mentioned the people, he was mentioning instructing them to do things, right? I don't know if he was instructing them to do things. He's referencing that, I think— He's apprising Simpson of, well, this went wrong with this guy, but I told this other guy to do this, and here's how we're going to sort it out. He's saying that things went wrong on occasion, correct. But the question here is control. And it's not just whether they exist. And it's not even whether these folks are selling drugs for Jackson. The question is, does he have some degree of control over them, or did he organize them? And that's what we don't have. Am I over? I'm over. Yeah, the red light's on. You have some rebuttable, I see. All right, thank you, Mr. Dinkin. All right, Ms. Franklin-Best? Yes, thank you, Your Honors. I'm here. I represent Mr. Simpson. I have a motion to answer Judge Hayton's question. It does not appear that counsel did join that motion. I would argue, though, however, for the sake of judicial economy, that if he is going to receive the benefit of this, that the court go ahead and do so now instead of waiting for this to arise by way of a 2255 motion. Because my time is short, I thought I would argue the search issue in this case, although, of course, I am happy to answer any other questions. The GPS tracker that was placed on Mr. Simpson's car was not supported by probable cause, and thus it was improper. First, the government challenges Mr. Simpson's standing, and respectfully, he did have standing. There's no doubt that Mr. Simpson had permission to drive the car, and as other courts have found, rejecting a defendant's ability to make Fourth Amendment challenges for technical violations would completely eviscerate Fourth Amendment protections. I found that to be a closer question in this case. I think the question might be, would he have standing if he had a girlfriend hire the car as a front to avoid being stuck with the car, being imputed to him, coupled with the fact that he also didn't have a driver's license, and so that his use of the car could almost be treated as an unauthorized or a stolen property, as the exception of the bird. And I understand. But you passed over the standing. I found the standing somewhat tough. I thought maybe there isn't standing. Well, I do believe. I mean, so the government sort of takes as a premise in this case that Ms. Ware was kind of a straw purchaser, right? I mean, that the whole purpose of her renting this car was so that he could use this for drug trafficking. But you know, that was more of an assumption than an actual proof. Well, there's quite a bit of evidence to support it. I mean, he did several that way, and he had his own cars. And so the inference can be drawn as the reason he's using rental cars is to escape connection and detection, which I must say we see in almost every drug case anyway. But we do have in this case also, I mean, additional evidence to show that he was a bit of a car guy. I mean, he had, you know, a Porsche. He had a Corvette. Yeah, but the question is whether the particular car involved in this case, which he had rented to his girlfriend in order to avoid detection in a circumstance where it might not have been an authorized use. But I would argue, you know, when we had sort of the testimony of Agent Cobbler, for example, who testified that he was unaware of any narcotics activity that actually happened with this Impala. So I mean, there's evidence to show that there was no drug trafficking from that particular car. You know, I would go back to sort of the language of Byrd that says that few protections are as essential to individual liberty as the right to be free from unreasonable searches and seizures. Oh, yeah, we agree with that. Exactly. And so I think, you know, to the extent that this is a close case, that we would err on the side of finding, you know, a reasonable expectation of privacy and giving him sort of the Fourth Amendment protections. So let's say you get over that. Why is the warrant invalid? I mean, there's just a feeling like we spend a whole bunch of time in cases like Jones saying, I feel like I've seen cell phone cases like this too. Like in Jones we say, if you want to put a tracker on someone's car, you've got to get a warrant. And the government's like, cool, we've got a warrant. And then the argument is, the warrant's invalid because it's a general warrant, it can't possibly be valid. It's like, surely no one in Jones thought the answer was, you've got to get a warrant and that warrant's necessarily invalid. No, absolutely. I mean, but, you know, I think what happened in this particular case, I think that, you know, this kind of came on the end of a previous case, the Sandoval case. And I think what happened here is that having disrupted that particular drug trafficking organization, I mean, I think that law enforcement here, frankly, got a little sloppy. They got a little maybe too self-confident. I mean, I think when you look at the language of the attitude. I guess some of your arguments for why this warrant is invalid strike me as an argument that all GPS tracking warrants are invalid. And I guess the one thing I know from Jones is I don't think it's plausible for me to say that all GPS warrant tracking warrants are invalid. Well, and I think that's accurate. But, I mean, I think when you're going to have a GPS warrant, for example, I mean, there still need to be some limitations. I mean, I don't think that every GPS warrant could be— Well, a limitation is probable cause. It is probable cause. If the warrant has probable cause, then the warrant issues, right? And there was no probable cause here, Your Honor. I mean, that is our argument. I mean, there was a confidential informant who was used as sort of the basis of a lot of this information. No reliability, the basis of the veracity and the reliability of that CES was not sufficiently outlined in the affidavit. He had not provided any information to them in the past. No information that was corroborated tended to show unlawful conduct. I mean, that particular CES, you know, identified the car. But where do it—it was issued by a judicial officer, wasn't it? I mean, it was. So then how do you get around Leon? Let's assume you somehow win that issue. How do you get around Leon? We have—well, first of all, I mean, the affidavit was facially inadequate to support the search. It failed to state with particularity the place to be searched. But also, the information that was presented at that truncated Frank's hearing militates against allowing a good faith defense in this case. For example, you know, Cobbler's statement in the warrant that the 1917— I'm sorry, the 2017 MPLA had been used for criminal activity, but then during his testimony in December of 2022 that it was not used for narcotics distribution. He also, in one of the pen register warrant, completely omitted the July 5th GPS tracker order. He also—lack of having engaged in any alternative investigative procedures. He offered mere boilerplate in attempting to meet the necessity requirement. You would really have these officers second-guessing the— I mean, they pitch what they think is probable cause. They put it in an affidavit, and an independent neutral judicial officer looks at it and said, I think there's probable cause to issue the warrant. And they issue it. Officers are supposed to say, no judge, you shouldn't have issued it. I mean, they take the warrant, and they do exactly what they're instructed to do by the law. And now we're going back and second-guessing whether the judge got it right. And may I respond to that, Your Honor? I see my time is up. I mean, you know, under that analysis, there would never be an improper warrant. No, we do. We have Frank's, you know, the whole Frank's doctrine. We have a bunch of doctrines that police these things. But we also have a process, and the process in this case was followed. Well, yes and no, because I would push back on that a bit and say, you know, Mr. Simpson asked for Frank's hearing in this particular case and was not allowed to have one. There was no evidence. Was there any evidence of deliberate lying in that warrant? He was not allowed to fully explore that particular issue. I mean, I think that there is nothing— He has a burden to even set forth enough to justify Frank's hearing. And respectfully, he did so. I mean, so my time is up. Thank you. All right. We now move over to the other side, and Mr. Honnold. You have a lot of defendants to speak about. Yes, Your Honor. Good morning, and may it please the Court. Daniel Honnold for the United States. Of the many issues that— Can we start with double jeopardy? Yes, Your Honor. Okay. So you know how the blockburger test works. Here's the following question that I've not been able to figure out the answer to. Please describe a set of facts that constitute murder for hire that do not constitute conspiracy to commit murder. Yes, Your Honor. One situation that I've been able to think of is when the other participant, for example, the person who is arranging for the purported hit, is a government agent. That's not conspiracy because you can't conspire with a government agent? That's correct. That's the Hackley case. We don't cite it for that proposition in our brief, but that case is in our brief. And then the person goes on to travel— What if the conspiracy is a difference? You have a leader of a mafia, and he directs his lieutenant to hire a hitman to take out an opponent. The conspiracy is the agreement to go hire somebody and hit. The actually hiring is another conspiracy, but it's distinct. You can't rely on the same conduct in the hiring. You have to have a separate conspiracy to commit the crime, the whole crime. And I don't see that that violates our normal conspiracy versus the conduct, underlying conduct crime. Yes, Your Honor, and we do start from the point that— The element is the new agreement to commit the whole crime. You can't use an element of the crime you're going to commit to be the conspiracy. You've got to use a different conspiracy. And the completed conduct is the differential. I mean, there's two aspects. Both crimes require acts different from the other under Blackburn. I think, in general, Your Honor, yes, that's right. I mean, I don't think we have to get to sort of a very narrow possibility that, oh, one of the persons is a federal agent. It's just got to be a conspiracy to commit crime for hire. So the conspiracy element can't be the hiring part. It's got to be a conspiracy to commit that crime. And that requires additional conduct. Now, hiring the person is the element of the crime, and that also is a conspiracy within that crime. I don't think one satisfies the other. That being said, Your Honor, in all candor to the court, that individual may also be guilty of substantive murder for hire in that he causes someone to travel interstate commerce with the intent that that murder be committed. So I don't know that that gets us out of that situation. My hypothetical was basically to respond to the narrow point that their basically sole argument on this is that whenever you prove consideration, you've effectively proved the conspiracy such that conspiracy is a lesser-included offense. And that would be one situation where that's just not true. It's true.  Sorry. So I can walk through this hypothetical. The version, then, is I can't be guilty of conspiracy to commit murder in that situation because my co-conspirator is a government agent, and you're representing that I can't conspire with a government agent, even if I don't know he's a government agent, but that I can provide consideration to the government agent to ask him to do something that he's definitely not going to do because he's a government agent. Yes, Your Honor. OK. What's the best authority for that proposition? Well, Your Honor, actually, I was thinking of the reverse situation in which the government agent is the promisor. In that situation... Sorry. The murderer or the hirer? Is the government agent the person who says, I want you to kill someone, but I don't really want you to kill someone because, of course, I don't want you... Or is the government agent the one who says he's going to kill someone but is actually never actually going to kill someone? The former. And in that situation, the person who would be the murderer can still travel in interstate commerce or use an interstate facility in receipt of the promise of pecuniary value. But that's OK. And that's not your fault at all because I phrased the question this way. But under Blockburger, the question is not, describe a factual... Under Blockburger, it's that each requires proof of a fact, the other does not. So what is the fact that conspiracy requires proof of? And so you're going to say agreement, that murder for hire does not? So what I'll say is... I guess what I'm trying to figure out is... Maybe I'll phrase it this differently. So the argument is about consideration as the element of murder for hire. What is your definition of consideration that doesn't include an agreement between two people? It's not that consideration doesn't involve an agreement between two people. It's that there may be factual scenarios in which proof of a conspiracy is not going to match up perfectly with consideration of that. But the Blockburger question is whether each requires proof of an element, the other does not. That's the Blockburger definition, right? I believe so, Your Honor. So what's the element that conspiracy to commit murder requires, that solicitation... that murder for hire does not? The element of conspiracy? And I say that... So there's all these cases you cite. You said there's a mountain of authority. With all respect to all those opinions, I read every single one of them, and every single one of them just repeats the obviously true proposition that conspiracy to commit a crime and committing the crime are not the same thing. Let's assume that I 1,000% agree with that proposition. But what none of them do is say, like, how does that map on to the actual crime of murder for hire? And how does the crime of murder for hire require proof of an element that conspiracy does not? And I don't think a single one of the opinions that you cite in your brief actually engages with that question in any meaningful way. They just recite the general rule. There's a difference between the substantive offense and the conspiracy offense. I hear you. I think that's not an unfair characterization of that case law. I think what I'll say is, and I haven't done all the research to figure this out, I think there's a split of authority on whether 1958 conspiracy has an overt act requirement, and in the situation in which a conspiracy has an overt act requirement, it's theoretically possible to prove substantive murder for hire by use of traveling interstate commerce or using an interstate facility in a way that would not constitute an overt act. I'm just not sure if in this particular jurisdiction or generally it's the government's position that overt acts require it. So obviously I'm building a lot of assumptions into the question I'm about to ask you. You're not conceding anything by answering the question I'm about to ask you. Assume for the sake of argument that with regard to at least one defendant we disagree with you, what would be the remedy? If we think that seven and eight are duplicative and they violate the Double Jeopardy Clause, at least as applied to the defendants who properly raise that issue, what would be the remedy for that? I think it would just be the vacateur of what Your Honors would have to hold as a lesser-included offense, which would, I think, be the conspiracy count. But as a practical matter, and that you'd probably have to resentence the defendants, but skipping to the end, realistically, we're all probably going to get the same sentences? I don't know that you would even need to remand for resentencing. I'm not sure to remand resentence if it's two concurrent offenses and one is reversed. I think you have to vacate that sentence. But is there authority that says we have to resentence? I think it's within the Court's discretion as to the scope of the remand that's required. I mean, it could play into the... I'm forgetting the term right now, but the Sentencing Package Doctrine. That's what I was thinking of, too, is the Sentencing Package Doctrine. I think in a situation like this where you're merging a lesser-included offense into a greater-included offense where both of them have concurrent life sentences, the Sentencing Package Doctrine is not going to apply. So you would just vacate. So can I turn you then to the... It pains my heart because courts keep using these words when it's the standing question. It breaks my heart to call that a standing doctrine because it's obviously not standing. But I guess I'll say, so I know that the mere fact that it's not your rental car means you don't have Fourth Amendment... That doesn't prevent you from having Fourth Amendment standing. And then there's the Second Circuit opinion that the government asks us to endorse that says, yeah, okay, not your rental car is not enough, but not your rental car plus not licensed driver? I don't understand. I mean, I don't mean this... I literally don't understand why that fact would possibly change the Fourth Amendment standing analysis. I think the place to look for that, Your Honor, is Byrd, which says that the reasonable expectation of privacy analysis has a lot to do with the property rights and society's reasonable expectation of privacy that... But we've already crossed that bridge when we said it doesn't have to be my rental car, and I don't understand why whether I'm a licensed driver or not affects that analysis. It affects it in the following way. As opposed to, you know, say, a car that you own outright, an owner was going to have a larger bundle of property rights in that car. They can own it, they can put it in their garage, they can fix it up, they can tweak it, they can show it off, they can do whatever they want. Your bundle of rights with respect to a rental car is much narrower. You really only have it for a brief period of time to drive. You can't do maintenance on it, you can't fix it up, you can't paint it, you can't do any of that stuff. It's really just for driving on the public roads under the terms of that agreement. And if you, as an individual, don't have the thing that is required, a license, to do the one real thing that you can do with a rental car, that impact... So this is how you would distinguish... I was thinking of the example of my hypothetical 15-year-old child who owns a car that they're not allowed to drive. Surely they have a reasonable expectation of privacy. If the car is parked on the street outside my house and the government agent breaks into the car owned by my hypothetical 15-year-old child, they have standing under the Fourth Amendment to challenge you doing that, even though they don't have a driver's license, right? I think that's right. And the differentiation there is what your child can do with that car that you've given them. And so I think that's the additive function of those two aspects. That's why they make sense to go together. And so we would ask this Court to follow Lyle and Hammond from the Seventh Circuit, which predates Byrd but which survives Byrd. I think there's a split among the circuits on whether the unauthorized license is enough. It seems to me in some circumstances it might be, in some others it might not be. But I think what it seems would be unanimous among the circuits is if you consider not only unauthorized license but the fact that the arrangement was reached in order to protect the defendant from being traced, used for unauthorized purpose of drug dealing. It seems to me at that point the authorization to use a car is similar to having stolen a car. And of course the Court has agreed, the Byrd Court has agreed that a stolen car, you don't have a right to privacy. Yes, Your Honor. And that's the possibility that Byrd left open in its remand. And of course the defendant in Byrd I believe had a valid license. Did you make a Byrd exception subterfuge argument here? We did not. I was really looking for it because it's the one the Supreme Court left open. Yes, Your Honor. We did not. I wouldn't say that we made it in precisely those terms. So we haven't put it forth. Here we are really relying on the unauthorized driver from the rental agreement plus the lack of a valid license. Can I flip the hypo differently? I'm just trying to make sure. So I think you'd also probably agree with me that let's say the Impala is not a rental, and that Simpson actually owns it, but he still has a suspended license. He clearly has Fourth Amendment standing then, right? Yes. So it's just sort of weird that saying there are two conditions, neither one of which alone deprives you of Fourth Amendment standing, but somehow when I put them together they magically deprive you of Fourth Amendment standing. It just seems real weird to me. I understand the Court's hesitation, but again, I think it goes back to Byrd. It's, you know, what are the property interests at play here? What are society's reasonable expectations that we impose on certain situations? And here I think society recognizes that there is a big difference between the rights that you have with respect to a rental car and the rights that you have with respect to a car that you own outright or that you're leasing or that's in your name. The Supreme Court has defined the right to be the lawful – you have lawful possession. And if you steal a vehicle, you don't have lawful possession and you have no rights to argue that they can't search the vehicle. The rub comes as to what lawful possession means and some courts think that you would not have lawful possession without a driver's license because the rental company wouldn't lease it to you. But some other courts have hypothesized factual circumstances where there may be, even in that circumstance, some kind of – I don't know how they do that. But it seems to me if you add the subterfuge, which is in this case, it's hard for him to claim that he's protected because of his possessory interest in that vehicle. Yes, Your Honor. We agree with that sentiment in the sense that – Because a possessory interest can't just be a possessory interest. It has to be a lawful possessory interest. It does and that's why that unauthorized driver aspect is a major component of this analysis. Would it be lawful for him to possess any car, not just a rental car? He doesn't have a driver's license. Can he lawfully possess a car? I think so. I think he just can't operate it. The only thing that makes him not able to operate the car without a driver's license is – or not lawful to have it without a driver's license is the rental agreement, right? I thought that's what you had just said. You said it was the rental agreement. They would never rent a car if you didn't have a driver's license. Yes, but if I heard Your Honor correctly about unlawful, I don't know that it's a crime in North Carolina to possess the rental car being an unauthorized driver. So it's not that it's – but taking a step back, the reasonable expectation of privacy – So how is Byrd satisfied then? How is it unlawful? Reasonable expectation of privacy doesn't turn on whether the conduct is unlawful. Why would it have to break the law? I mean the idea of the rental is whether – now the rental company has the fee simple possession of that car and they rent it out only to certain people. And it seems to me you don't get possession if you would not have qualified to get part of the rental company's fee simple interest in that car. But hasn't Byrd told us that that's not – I mean if you're not the person they rent it to and you're not allowed to drive it under the rental agreement, but that – you still can have a right to privacy, right? That's what Byrd's about. That is correct under the practice of Byrd where you've got someone who's got a lawful operator's license. What's – the unlawful aspect here is not his, you know, sitting behind the wheel in his driveway. What's unlawful about it is that he's operating it on the roads. Okay. So let me change the hypo again. And now he's not illegally driving the car. So let's say someone rents the Chevy, parks it in front of Simpson's house, gives him permission to use it. Simpson has a suspended license, same as here, leaves the car parked in the street, stores things in the trunk. The government installs a GPS tracking device while it's sitting on the street. Does he have forthwith standing then? I think so, Your Honor. And, you know, here we didn't – Wait, you think he does then? Well, we didn't place the GPS tracking device. No, no. Of course, I know that's a hypothetical. But you think he would have forthwith standing in that situation? Yes, Your Honor. I think – Then why doesn't that give the whole ballgame away? Because now you've conceded that a guy who doesn't own the car and who doesn't have a valid driver's license sometimes has forthwith standing. Oh, I'm sorry. He does not have forthwith standing. Why? Because – It's totally lawful for it to be parked in the street in front of his house. He's not driving the car. In my hypo, he is not illegally driving this car. I think the main thing to take away from this is that the reasonable expectation of privacy analysis does not turn on whether at a particular moment you are committing a crime. It also might suggest it doesn't turn on whether I have a valid driver's license or not. I think it does, Your Honor, because that goes to the property aspect of it. Remember, he's still got the same bundle of rights, the same limited bundle of rights in that rental car. I can't own things that it's illegal for me to use. Can't I? People can definitely own – So, I mean, in a former life, I worked on a case involving, for example, a guy who'd been convicted of a crime that made it illegal under federal law to possess a firearm. And the question was whether or not he could transfer that firearm – this is Henderson v. United States, I think – whether he could transfer the firearm to someone else. And the government's like, no, he can't. And the court's like, no, that's wrong. It's illegal for him to possess the firearm. It doesn't mean it's illegal for him to own the firearm. And as long as it's legal for him to own the firearm, he can give it to someone else. That all may be true, but that doesn't strike me as a Fourth Amendment reasonable expectation of privacy. No, but it does suggest that there's a difference between owning something and being legally entitled to use it in a certain way. Right. I think maybe I can try to elucidate it in this way. It's not a crime to visit a friend in their house, but you don't have a reasonable expectation of privacy in their house. It doesn't really matter whether you're committing a crime when you go in their house. You just don't have a reasonable expectation of privacy. But to continue with that example, I do if I'm an overnight guest. Yes. But this is not— Even though I have no property interest in my friend's house, even though my friend could kick me out at an instant, then I'm an overnight guest. No, maybe not. Many, if not most, overnight guests do have Fourth Amendment stamina. That is generally true, Your Honor, and that's a situation in which society has recognized that people have a reasonable expectation of privacy in that situation. This is a very different situation where you are being an unauthorized user of a rental car, which I think society, the average person would recognize as opposed to being an overnight guest in someone's house that they own or lawfully rent. So it really feels like we're just relitigating the case the government already lost in the Supreme Court. Well, Mr. Byrd did have a valid driver's license, and I think that does change the landscape here. But even if this court found that Mr. Simpson had a reasonable expectation of privacy, the affidavit here provided adequate probable cause for the officers to place that GPS warrant. I think there are three kind of sub-factors to this. The first is the confidential informant that formed part of it. The other is staleness. And then the third is the general warrant aspect that Your Honor was addressing with my colleague. So I'll just take them in order, and I realize we're kind of getting down to time. I'm happy to turn to anything else at any time. As to the confidential informant, this was a known informant that had been working with the officers for the previous 18 months. This is not an anonymous tipster. This is someone who had come in and debriefed with the officers multiple times. You can get that from just looking within the four corners of the warrant. He's corroborated in multiple ways, including by indicating the extent of the Sandoval operation, which then leads to an arrest and takedown and recovery of multiple dealers' drugs, the naming of the cars, the Corvette and the Porsche, and several other facts along those lines. So this confidential informant, CRS 1, as he's noted in the affidavit, fits comfortably within this court's existing case law on the reliability of known informants. That's what we're dealing with here. As to the staleness, as the district court incorrectly found, Mr. Simpson was a major drug trafficker through undisputedly up until the arrest of Mr. Sandoval in early June of 2016. The question is, in that intervening time period between then and July of 2017, what's the evidence that he has desisted, or what's the evidence put another way that he's continuing to engage in suspicious activity? It's twofold. One, it's the sheer size of the operation. He's moving multiple millions of dollars and dozens and dozens, if not hundreds, of kilograms of cocaine up until June of 2016. In the district court's experience, and as mentioned in Incarnacion, someone of that volume is not going to simply put up shop and go home when their one supplier is arrested and they go find somebody else. And then Simpson is continuing to use these rental cars, which, from the 10th Circuit Williams case and I think any reasonable magistrate would be entitled to infer, that's continued suspicious activity that makes it much less stale. Finally, as to the generality of the warrant, I think, with respect to my friend, we're looking through the wrong end of the telescope on the generality point. It's quite clear that this warrant is highly particularized. The affidavit is for a specific vehicle denoted by VIN, license plate, state, license plate number, make, model, year, color. Anything that you would want to describe a car is included in this affidavit, and it's for a specific period of time. That's about as particularized as you could want to be. What's the standard of review for us to, when there's not a Frank situation, for us to review a warrant issued by a district, by a judicial officer? I believe the question of whether there's adequate probable cause is a question of law that's reviewed de novo, but I think under any standard of review, the probable cause here is going to survive and it's especially going to survive under the much heightened, much more heightened standard of the binomially on good faith analysis. So again, in terms of generality, I think, as Judge Heitens was alluding to, Jones is going to come out differently if their theory is correct. It would be like after Carpenter saying, turns out you can't ever actually get a warrant for a cell phone. It's like, well, then that was a lot of trouble to say that you've got to get warrants to search cell phones. Absolutely correct, Your Honor. I think it's common understanding that when you're collecting location information for a particularized object, such as a particular car or a particular cell phone number, those things can travel interstate, can travel throughout the country, and you're going to be able to collect that location information about it wherever it goes in the country, and that doesn't make something general. That just makes it broad. Unless there are any further questions on the suppression issues, I'll turn to the sufficiency claims. I heard one by my colleague for Mr. Evans and one by my colleague for Mr. Jackson. I'll start with Mr. Evans. The intent to commit murder for hire before engaging in interstate travel for Mr. Evans. We presented at trial significant circumstantial evidence that any reasonable jury could use to infer that he knew the purpose of his trip to Norfolk before he took it from North Carolina. We've got the relationship between Evans and Shipman. They were roommates, they were friends. They then moved apart from each other, but there's a phone call, a 14-minute phone call, just days before the murder. We don't have the contents of that, but in the light of all the other evidence, any reasonable jury could infer that the purpose of that extremely long phone call for them was about going there to commit this murder. They then go, and as Judge Heightens pointed out, in his discussion with Alvon Davis, with Mr. Evans there, they're discussing in explicit detail how this is going to go. Mr. Shipman's going to be the driver, Mr. Evans is going to be the shooter. Mr. Evans doesn't say a word about it. That is really strong evidence that he knew the purpose of this trip before he ever set foot out of North Carolina. And then, of course, we've got the implausible story that he told to the FBI, further evincing his consciousness of guilt. Turning to Mr. Jackson, his challenge to the... Can I take you back to your argument on the double jeopardy that someone has pointed out to me? If your argument on that is right, that, like, you can't conspire with the government, why doesn't that suggest the Supreme Court's decision in Rutledge is wrong? Because wouldn't that argument suggest that the Supreme Court was wrong to say there was a double jeopardy problem in Rutledge? This is the continuing criminal enterprise and conspiracy to distribute drugs. Yes, 846 conspiracies will merge into CCE under 848 under Rutledge. I don't know... Like, your whole, like, you can't conspire with the government element, and that's... Which sounds, like, plausible, and I've been trying to figure out what, if anything, is wrong with it. But then the thing I've stumbled upon is why wouldn't that suggest that Rutledge is wrong? Off the top of my head, I'd have to think back through Rutledge and the technical analysis that I need to engage in. Rutledge is really an overlap of the same conduct. The enterprise and the conspiracy are really part of the same conduct. I do not think that that precludes at all a conspiracy to commit murder for hire because the persons outside of the murder for hire crime would be the conspirators. And the person who directs it and even funds it would have to be separately proved. You also have to prove the contract to hire, which is inherently a conspiracy. But that is a distinct conspiracy under the crime, distinct element. One is the plan and agreement to commit that crime, and the other is the crime itself, which includes the hiring. I just don't see a problem with that myself. Under Rutledge, I think it's not even... Rutledge had a totally different issue. It was the same overlapping conduct. Rutledge has an in-concert element. That is what incorporates the conspiracy aspect of the 846 conspiracy. As I stand here right now, I'm not able to think through... I understand. I apologize. No, it's like a fourth-level question out of order. Thank you. Could you just address briefly, we've got a few minutes, address briefly Shipman's sufficiency claim? Shipman's sufficiency claim, Your Honor? Yes, Your Honor, I'm happy to. So Shipman raises a number of sufficiency claims. He's got a challenge to... Basically that he was aware of the conspiracy. Yes, this is the challenge, I think Your Honor is adverting to, to his conviction on count four, which is the drug murder conspiracy aspect of it. So I think we start from the point that, I think as he acknowledges in his brief at page 80, he's aware that there's a conspiracy when this is happening. I think the questions are, did the government present sufficient evidence that he knew that this was a conspiracy for cocaine? And did he know that this was a conspiracy for at least five kilograms of cocaine? And I think at least as to the first and probably as to both, at 4097 when he's discussing in explicit detail with Alvon Davis why he's there to do what he's there to do, it's because someone ran off on the plug, can't pay. What's the definition of a plug? A plug is the person, this is from Mario Love, and also I believe from Alvon Davis, the plug is the person that has the connection to the cocaine. This is a person who has a significant source of supply, and Mario Love's testimony specifically ties it to cocaine. So that's where you can pair those up and get that understanding from that. And then as to the size of it, this is a hit contract for $10,000 per victim. He's got a pre-existing relationship with Jackson, so a reasonable jury could infer that he knows the extent of Jackson's activities. Jackson hires Shipman to go do this for $10,000 per victim, and he knows that he's doing it on behalf of a plug. This is somebody who's a repeat drug player and a major source of supply. So the idea that no reasonable jury could infer that it was for at least five kilograms, that he knew that, I think just doesn't fit with the evidence that we presented in this case. So that's his claim on count four. I'm happy to address anything else for Shipman's sufficiency. In the absence of those questions, I will turn to Mr. Jackson's CCE conviction under 848. I think we start with Butler and Ricks. The supervisor, leader, organizer requirement for 848E is not a terribly high requirement under those cases. You don't need to directly supervise any of the five people. Any management position is enough so long as this organization consists of five people. And I don't hear my friend to meaningfully dispute that this organization does in fact consist of five people. We have not only the people that directly testified, Crouch, Love, Wallington, Tate, McCrimmon, Ware, Farland, Crawford. We also have all the people that Mr. Jackson is referring to on the wire calls with Simpson. And I think it's really important to step back and remember these are calls clandestinely recorded by the government between the president of a drug organization and the vice president of a drug organization. There's no reason to think that Mr. Jackson is somehow fabricating the existence of these people or what he's doing with them. It's the VP reporting his activities to the president. And so I think despite my friend's arguments here, we have really solid evidence that he's directly organizing, supervising, and managing at least those five people even if he's not directly supervising the people that physically testified at trial. And I'm not aware of any case law for the proposition that you have to directly know the government names of the other people that you're supervising. I'm really coming down to time here. I did not have an opportunity yet to talk about Bruton. I'm happy to rest on the briefs with that. But this is Mr. Shipman's claim that... Well, can I just ask you the same question? I asked your colleague on the other side. Do you know of a case that says what the standard of review is of a district court's decision about whether something is facially incriminating? I don't. I didn't look for that specific question. I would just say I think for purposes of this argument since it hasn't been briefed up, you can assume that it's de novo review. You can look at the transcripts of the interview between Agent Terry and Mr. Evans, and you can see they're not facially incriminating in any way, Your Honor. If I could just have a brief moment to finish the response. What is your answer? Thank you. You look at those. It's about Mr. Evans and Mr. Shipman taking a less than 24-hour trip to Portsmouth, not Norfolk, to Portsmouth, pumping gas there, seeing a friend, and then going home. An outright denial of having any involvement in the murder. And that's just not going to be facially incriminatory in a way that needs to be redacted. I would point this court to Benson and the Fifth and Ninth Circuit cases cited in there, Lage and McKell, for that proposition. Situations in which you do not need to redact where the content of what is being challenged is not itself facially incriminatory. You only need to redact when the statements are otherwise facially incriminatory as to the co-defendant, who's not allowed to cross-examine. And therefore, Bruton is not implicated. I see I'm over my time. I'm happy to answer any questions about any of the other issues. And if not, we'd ask that Your Honors refer. All right, thank you. Thank you. All right, now we'll come back to Mr. Zirkin. Thank you, Your Honor. Very briefly, there's no evidence that ties Mr. Evans to the idea of consideration. A discussion about consideration, the fact of consideration, until he's back in Greensboro and he's counting money. That's the first time it comes up. That is insufficient to establish that prior to his going on this trip and crossing the border and engaging in interstate commerce, that he had interstate travel, that he in fact had, that knew this was a murder for hire. Shipment could have had any number of reasons that he wanted somebody killed. Assuming he had the 14-minute phone call, that the total assumption that what they're doing is talking about doing a murder. It doesn't mean it's necessary a murder for hire. He could have said, I've got problems in Norfolk. I need you to come do this murder to help me out on that. That doesn't mean that it's a murder for hire. And it has to be specifically, excuse me, that he knew that this was a murder for hire before he went, before he crossed the border from North Carolina to Virginia. Thank you. Thank you. All right, Ms. Carlton.  I want to address your question about the sufficiency of the evidence regarding Mr. Shipman in count four, which is committing the murder during the course of drug trafficking. There was no evidence at trial that Mr. Shipman was engaged in drug trafficking. And as this court has ruled... Well, I guess the question I'm trying to figure out is the government presented evidence that he was being brought in at that point to commit the murder for hire or participate in whatever. And he knows what's going on and what he's helping in the conspiracy and willingly does it. In other words, the question is, do you actually need acts in the furtherance of a drug transaction? Or is it enough if you further the interests of the conspiracy, which is the government's theory. In other words, he knows of the conspiracy, he knows what's going on, and he's now doing some enforcement work for the conspiracy. Is that enough? Well, the furthering the drug conspiracy, that is a separate section of the statute which was not charged here. To further the interests of the CCE... Well, to participate in the conspiracy. I mean, yes, they have to link him to the conspiracy, don't they? So for section three of the statute, yes, Your Honor, they would have to link him to the conspiracy. He'd have to be engaged in the conspiracy. But there's no evidence that he was engaged in a drug trafficking conspiracy. Well, the drug trafficking conspiracy included enforcement, doesn't it? Somebody steals drugs, somebody has to enforce it. Well, here... Somebody is threatening... I mean, there are a lot of aspects of drug trafficking conspiracy that don't involve actually participating in the transaction. But this court has ruled in Burgos that you have to share, you have to reach agreement to join the conspiracy? Yeah, you have to... Right? You have to have the mental state of wanting to further the interests of the conspiracy? And there's no evidence of that here. That's what's lacking here, is whether there's actions or not. It's like if you were the drug dealer, Your Honor, and you had hired someone to improve the security of your trap house... May I finish the analogy? Yeah, I understand it. I understand what you mean. Okay, thank you very much. Yeah, thank you. All right, I guess, Mr. Dinkin, you have a couple minutes. Regarding the sufficiency of the evidence for Mr. Jackson's involvement in the CCA, my colleague, I think, correctly indicates that under Butler, control does not need to be direct. But there has to be evidence of control, and that's what we don't have, or some type of supervision, organization, or management. And on the Simpson side of the operation, there's no evidence that Jackson had any involvement with those folks, and some of them even said so themselves. As to the other folks, the ones that are referenced, I think as Judge Prussian pointed out, there's discussions about problems with drugs. I think it was drug quality that they were talking about. But what wasn't there was any evidence that Mr. Jackson was in control of these folks, and if he was selling them drugs and they were doing what they wanted, then that's not control. Likewise, management or some type of organization. And so I think that's the distinction, and that's the evidence that's missing here. So for those reasons, we don't think that Jackson was part of the CCA. All right, thank you. All right, Ms. Franklin-Vest. Thank you, Your Honors. So the government did not advance the lower court below this Byrd subterfuge argument that was discussed earlier. Mr. Simpson was not allowed to introduce any evidence on that point, and so it would be fundamentally unfair to use that as a basis for rejecting his claim. I think that when you look at the evolution of these cases in the Fourth Amendment context, from Jones to Carpenter, when you look at the numerous concurrences in Chaptree, it's sort of a rejection of this possessory interest argument that I understand the government to have advanced up here. It is reasonable to believe that you have an expectation of privacy in a car that you have permission to use, and if there's some sort of a violation. The court used the word lawful, and everybody's trying to, a lawful possession, and it doesn't focus on whether the activity is lawful, but it focuses on whether the possession is lawful, and it's a degree of property interest that the court's focusing on, so that if you own the car, it doesn't matter whether you have a driver's license or whether you have protection at your car, and you expect privacy there. If you're a rental car, you have less, because you're authorized by the rental company within the parameters of the property. But if you're not even the renter, now you start getting marginal on your possession, and the Supreme Court has indicated there are lawful possessions under that. So now you go a little further, and you don't have a driver's license, which is not a question of awfulness, but it's a question of whether the rental company gave you, implicitly gave you authority, possessory authority. And then you can keep going on, so the whole question comes down to the legitimacy of his claim to possession. And even if the car's parked in front of the house, he doesn't have possessory interest in the trunk or whatever, unless he lawfully has some possessory interest, I think. I think that's what I understand Bert to be saying. Yeah, if I may respond to that. Because on the record that we have here, we have someone who has been allowed to use this car and who has a suspended license. That, it is reasonable for somebody to have an expectation of privacy under those conditions. I see my time. Okay. Thank you. We have a big trial, and we have a lot of lawyer services here. And I noticed that Mr. Zirkin and Ms. Carlton and Mr. Dinkin, you were court appointed, and I want to recognize that service. It's so highly important. I think our system can be proud in the world and in world history to know that we provide services like this to our defendants. Of course, I appreciate the services of all lawyers. Our American bar is above all. And so we'll adjourn for the day and come down and greet counsel.
judges: Paul V. Niemeyer, Allison J. Rushing, Toby J. Heytens